# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KARI  OXFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHEM LIFE INSURANCE COMPANY | ) | Case No. 1:11-cv-00507-TWP-DML |
| Other Affiliate WELLPOINT, INC., | ) | |
| MED-ASSIST, INC. SHORT TERM | ) | |
| DISABILITY INSURANCE PLAN, | ) | |
| MED-ASSIST, INC. LONG TERM | ) | |
| DISABILITY INSURANCE PLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment. Plaintiff Kari Oxford ("Ms. Oxford") brought this claim under the Employee Retirement Income Security Act ("ERISA") against Defendants Anthem Life Insurance Company, other affiliate WellPoint, Inc., ("Anthem"), and Med-Assist, Inc. Short Term Disability Plan, Med-Assist, Inc. Long Term Disability Plan ("Med-Assist") (collectively, "Defendants").  On summary judgment, Ms. Oxford alleges Anthem wrongfully failed to provide her with a full and fair review of her claim for disability benefits, rendering Anthem's decision to deny her disability benefits arbitrary and capricious.  Anthem alleges it possessed a rational basis and explanation for terminating Ms. Oxford's short term disability benefits and denying long term disability benefits.  For the reasons set forth below, the Court **DENIES** Ms. Oxford's motion (Dkt. 39) and **GRANTS** Anthem's motion (Dkt. 45)

# I. BACKGROUND

Ms. Oxford began her employment at Med-Assist on April 20, 2009, as an Eligibility Manager, and was responsible for evaluating staff progress, maintaining employee records, quality assurance, data integrity, reporting, and other tasks.  Med-Assist offered both a short term disability plan ("STD Plan") and long term disability plan ("LTD Plan") to employees.  Ms. Oxford participated in both plans, which were underwritten and administered by Anthem Life Insurance.  On October 12, 2009, Ms. Oxford began treatment with Dr. Lori Hurst ("Dr. Hurst") for lower back pain.  Because of her back pain, depression, and anxiety, Ms. Oxford's last day of work at MedAssist was October 21, 2009.  She subsequently filed for both short term and long term disability benefits under the plans.

## A.   Ms. Oxford's Claim for Short Term Disability

### 1.   Pertinent Definitions under the Short Term Disability Plan at Issue

The STD Plan defines disability as the following:

> **Disabled and Disability** mean during the Elimination Period and thereafter because of Your Injury or Illness, *all* of the following are true:
>
> - You are unable to do the Material and Substantial Duties of Your Own Occupation; *and*
> - You are receiving Regular Care from a Physician for that Injury or Illness; *and*
> - Your Disability Work Earnings, if any, are less than or equal to 80% of Your Weekly Earnings.

Dkt. 37 at 0630.  Additionally, the STD Plan provides the following relevant definitions:

> **Elimination Period** means the period of continuous Disability which must be satisfied before You are eligible to receive benefits under the Policy. The Elimination Period is shown in the Schedule of Benefits of this plan and begins on the first day that You meet the definition of Disability….
>
> **Material and Substantial Duties** means duties that:

- Are normally required for performance of Your Own Occupation or any occupation; *and*
- Cannot be reasonably omitted or modified except that We will consider You able to perform the Material and Substantial duties if You are working or have the capability to work your normal scheduled work hours.

**Own Occupation** means the occupation that You regularly performed and for which You were covered under the Policy immediately prior to the date Your Disability began. The occupation will be considered as it is generally performed in the national economy, and is not limited to the specific position You held with the Plan Sponsor.

**Regular Care** means:
- You are under the continuing care of and personally visit a Physician as frequently as is medically required according to standard medical practice, to effectively diagnose, manage and treat Your disabling condition(s); *and*
- You are receiving appropriate treatment and care of Your disabling condition(s) which conforms with standard medical practice by a Physician whose specialty and clinical experience is appropriate for Your disabling condition(s) according to standard medical practice.

Dkt. 37 at 0621–24.  Additionally, the STD Plan defines "pre-existing condition":

A **Pre-Existing Condition** is an injury or illness for which You did, or an ordinarily prudent person would have done, any of the following within 3 months prior to the date on which You became insured under the Policy whether or not that condition is diagnosed at all or misdiagnosed during that period of time:
1. visited or consulted a Physician, Hospital or Medical Facility or
2. took clinical tests or received treatment. This includes (but is not limited to) taking pills, injections, or other medication to treat any condition.

Dkt. 37 at 0641.

Further, the STD Plan provides:

Your Insurance coverage will end on the first to occur of the following dates:
1. You are no longer Disabled under the terms of the Policy; *or*
2. You are no longer receiving, accepting, or following Regular Care from a Physician; *or* …
12. With respect to a Mental Illness, that You are not under the continuing Regular Care of a Physician specializing in psychiatric care….

Dkt. 37 at 0633.  Finally, the STD Plan addresses the Plan administrator's explicit discretion as

follows:  "We [Anthem] will make the final decision on claims for benefits under the Policy.

3

When making a benefit determination, We will have discretionary authority to interpret the terms and provisions of the Policy."  Dkt. 37 at 0641.

>   2.   **Facts Relating to Ms. Oxford's Medical Conditions and Initial Short Term Disability Claim:  October 2009–January 2010**

On November 11, 2009, Ms. Oxford applied for short term disability benefits under the STD Plan.  Dr. Hurst completed and signed Section III of Ms. Oxford's claim form, listing Ms. Oxford's current diagnosis as "anxiety, back strain" and a treatment plan consisting of counseling with Jeanette Walton ("Ms. Walton").  Dkt. 37 at 0057.  Dr. Hurst also wrote that Ms. Oxford was not released to return to work and date of return was unknown, but would be determined by the counselor.

On November 17, 2009, Anthem sent Ms. Oxford an acknowledgment of her claim for benefits and requested Ms. Oxford's medical records from October 1, 2009 through the present. In response, Dr. Hurst submitted her treatment notes, which highlighted Ms. Oxford's back pain and anxiety.  Also in response, Ms. Walton, Ms. Oxford's counselor, submitted her clinical notes from the requested time period and a Certification of Health Care Provider for Employee's Serious Health Condition.   In the Certification, Ms. Walton stated Ms. Oxford suffers from anxiety, depression, severe joint pain, chronic back pain, and other ailments that prevented her from performing her job.  Ms. Walton wrote that the possible duration of the condition was eight to twelve weeks.  Dkt. 37 at 0044.  A November 24, 2009 MRI scan of Ms. Oxford's lumbar spine came back normal, with mild degenerative changes at the two lower levels of the spine.

On December 14, 2009, Anthem notified Ms. Oxford that her benefits were approved from October 22, 2009 through December 1, 2009.  The notice instructed Ms. Oxford that if she continued to be disabled past December 1, 2009, her medical provider should contact Anthem

with updated medical information on her disability status, condition, and ongoing medical information.

December 1, 2009, Ms. Oxford was treated by Dr. Phillip C. Sailer at the Indiana Orthopaedic Center.  Anthem received the records from this appointment on December 31, 2009.  Dr. Sailer's notes stated that Ms. Oxford had "multiple complaints including her right hand, her foot, as well as her low back" and that "she has had chronic problems with her hand and back."  Dkt. 37 at 0015.  The notes further stated that Ms. Oxford has a "history of fibromyalgia and her symptoms are fairly sporadic."  Dkt. 37 at 0015.  His diagnostic impressions stated that Ms. Oxford has "long-standing low back pain in the setting of fibromyalgia," "right carpel tunnel syndrome," and "right plantar fasciitis."  Dkt. 37 at 0016.

Ms. Oxford was treated again by Dr. Hurst on January 5, 2010.  At this visit, Dr. Hurst noted that Ms. Oxford was having whole body pain and diagnosed her with fibromyalgia and back pain.  Anthem received the record of this appointment on January 11, 2010.[1]  On January 19, 2010, Anthem contacted Ms. Oxford concerning her treatment.  Ms. Oxford told Anthem she had to stop counseling and physical therapy due to lack of money to pay for services.  Thereafter, on January 19, 2010, Anthem informed Ms. Oxford that her claim for disability was terminated effective December 1, 2009, due to a lack of medical evidence supporting her disability beyond December 1, 2009.  Anthem specifically noted Ms. Oxford's "unremarkable" MRI scan, her failure to continue physical therapy, and her failure to continue counseling.[2]  Dkt. 37 at 0008.

Ms. Oxford appealed the termination of her short term disability benefits in a January 28, 2010 letter, which Anthem received on February 9, 2010.  In her appeal letter, Ms. Oxford

---

[1] Ms. Oxford also had a follow-up appointment with Dr. Sailer on January 5, 2010, but Anthem did not receive this record until February 9, 2010.

[2] Ms. Oxford had informed Anthem in the January 19, 2010 telephone call that she could not afford these services.

addressed the reasons cited by Anthem for its denial of her claim.  First regarding her failure to receive regular care, Ms. Oxford explained she had two follow-up appointments with Dr. Hurst and Dr. Sailer.  She stated that she was unable to go to therapy because she was not covered by insurance and that she did receive a steroid shot for her carpal tunnel syndrome.  Ms. Oxford also stated that her back issues could not be resolved, and she was placed on pain medication as well as anxiety and depression medication.   Second, regarding her mental disorder, Ms. Oxford explained she had not seen her counselor since early December, but had been regularly attending AA meetings each week.

### 3.   Facts Relating to Ms. Oxford's Short Term Disability Appeal:   February 2010–May 2010

On February 19, 2010, Ms. Oxford had a physical therapy evaluation and began aquatic therapy and physical therapy on February 22, 2010 through March 30, 2010.  On February 25, 2010, Ms. Oxford had carpal tunnel release surgery performed on her right hand and wrist by Dr. Sailer.  She followed up with Dr. Sailer on March 12, 2010.  Also in February and March 2010, Ms. Oxford began seeing Pamela D. Kinney for counseling.

On March 18, 2010, Kali McCloud, Quality Management Specialist/Appeal Coordinator for Anthem, notified Ms. Oxford that her STD plan required a pre-existing condition investigation, based upon her hire and benefit eligibility dates.  That is, because Ms. Oxford filed a STD claim within the first twelve months of her employment, her claim was subject to three-month pre-existing condition exclusion.[3]  To complete the investigation, Anthem requested the contact information of each of Ms. Oxford's treating physicians from April 1, 2009 through June 30, 2009.   Anthem also requested a list of all prescription drugs and dosages prescribed, including the contact information of the pharmacies which filled the prescriptions.  Ms. Oxford

---

[3] Such an investigation presumably should have taken place upon Ms. Oxford's initial claim submission, but for whatever reason, Anthem did not undertake the investigation until the appeal was under way.

provided the requested information to Anthem on March 20, 2010 and April 6, 2010.  Ms. Oxford listed five medications prescribed and taken from April 1, 2009 through June 30, 2009. Anthem then requested three independent peer reviews of Ms. Oxford's medical records, including Marcus Goldman, board certified psychiatrist ("Dr. Goldman"), John Fiedor, board certified orthopedic surgeon ("Dr. Fiedor"), and Dayton Dennis Payne, board certified internal medicine and rheumatology ("Dr. Payne").  The reviewers were asked to determine if objective medical findings supported Ms. Oxford's claim of short term disability, and if she was treated or took medication during the pre-existing period of April 20, 2009 through July 19, 2009.

Each reviewer determined that the objective medical evidence did not support Ms. Oxford's subjective complaints that she was unable to work past December 1, 2009.  Dr. Goldman did not note any psychiatric treatment during the pre-existing treatment period.  Dr. Goldman determined that the data from Ms. Oxford's records and from discussions with Ms. Walton and Ms. Kinney did not support a significantly impairing psychopathology.  Dr. Fiedor reviewed Ms. Oxford's records from an orthopedic standpoint.  He noted Ms. Oxford took several medications during the pre-existing treatment period.  He determined that her back pain complaints were treated adequately with physical therapy and she should be able to do light work with certain restrictions.  Dr. Fiedor spoke with Dr. Hurst, who also stated Ms. Oxford could do light work with certain limitations.  Dr. Fiedor also concluded the objective medical evidence does not support Ms. Oxford's subjective complaints.  Dr. Payne reviewed Ms. Oxford's records from a rheumatology standpoint.  He noted he could not identify any specific evaluations or treatment during the pre-existing treatment period.  Dr. Payne determined that Ms. Oxford's rheumatology treatment was appropriate and that no evidence supported restrictions or limitations of Ms. Oxford's activities.

7

Based on the totality of Ms. Oxford's records as well as the independent reviews, Anthem denied Ms. Oxford's appeal on May 11, 2010.  Anthem concluded "the medical documentation does not support your request for disability.  There is also reference that you were treated for mental/nervous and pain related conditions during the defined pre-existing period."  Dkt. 37 at 0072.  Therefore, Ms. Oxford's appeal was denied and her file closed.

**B.      Ms. Oxford's Claim for Long Term Disability**

**1.      Pertinent Definitions under the Long Term Disability Plan at Issue**

The LTD Plan defines disability as the following:

**Disabled** and **Disability** mean during the Elimination Period and the next 36 months thereafter because of Your Injury or Illness, all of the following are true:
- You are unable to do the Material and Substantial Duties of Your Own Occupation; and
- You are receiving Regular Care from a Physician for that Injury or Illness; and
- Your Disability Work Earnings, if any, are less than or equal to 80% of Your Weekly Earnings.

Thereafter, Disabled and Disability mean because of Your Injury or Illness all of the following are true:
- You are unable to do the duties of Any Gainful Occupation for which You are or may become reasonably qualified by education, training, or experience; and
- You are receiving Regular Care from a Physician for that Injury or Illness; and
- Your Disability Work Earning, if any, are less than or equal to 60% of Your Indexed Monthly Earnings.

Dkt. 37 at 0676.  The following relevant definitions are also found in the LTD Plan:

**Elimination Period** means the period of continuous Disability which must be satisfied before You are eligible to receive benefits under the Policy. The Elimination Period is shown in the Schedule of Benefits of this Plan and begins on the first day that You meet the definition of Disability. . . .

**Material and Substantial Duties** means duties that:
- Are normally required for performance of Your Own Occupation or any occupation; *and*
- Cannot be reasonably omitted or modified except that We will consider You able to perform the Material and Substantial duties if You are working or have the capability to work your normal scheduled work hours.

8

> **Own Occupation** means the occupation that You regularly performed and for
> which You were covered under the Policy immediately prior to the date Your
> Disability began. The occupation will be considered as it is generally performed
> in the national economy, and is not limited to the specific position You held with
> the Plan Sponsor.

> **Regular Care** means:
> - You are under the continuing care of and personally visit a Physician as
>   frequently as is medically required according to standard medical practice,
>   to effectively diagnose, manage and treat Your disabling condition(s); *and*
> - You are receiving appropriate treatment and care of Your disabling
>   condition(s) which conforms with standard medical practice by a
>   Physician whose specialty and clinical experience is appropriate for Your
>   disabling condition(s) according to standard medical practice.

Dkt. 37 at 0665, 0667, 0669.  The Elimination Period is the longer of "189 days; or until the

expiration of any Employer sponsored short term disability benefits."  Dkt. 37 at 0667.

The LTD Plan has a pre-existing condition limitation, which is defined as:

> A **Pre-Existing Condition** is an Injury or Illness for which You did, or an
> ordinarily prudent person would have done, any of the following within 3 months
> prior to the date on which You became insured under the Policy whether or not
> that condition is diagnosed at all or misdiagnosed during that period of time:
> 1. visited or consulted a Physician, Hospital or Medical Facility *or*
> 2. took clinical tests or received treatment. This includes (but is not limited
>    to) taking pills, injections, or other medication to treat any condition.

Dkt. 37 at 0696.  Finally, the STD Plan addresses the Plan administrator's explicit discretion as

follows:  "We [Anthem] will make the final decision on claims for benefits under the Policy.

When making a benefit determination, We will have discretionary authority to interpret the terms

and provisions of the policy."  Dkt. 37 at 0703.

### 2.    Facts Relating to Ms. Oxford's Long Term Disability Claim: April 2010– May 2010

On April 1, 2010, Ms. Oxford applied for long term disability benefits.  Dr. Hurst

submitted an Attending Physician's Statement that listed Ms. Oxford's diagnosis as

"Fibromyalgia," "back pain," and "anxiety/depression."  Dkt. 37 at 0274.  Dr. Hurst categorized

Ms. Oxford's physical impairment as "Class 4," meaning "[m]oderate limitation of functional capacity; capable of clerical / administrative (sedentary) activity," Dkt. 37 at 0274, and Ms. Oxford's mental impairment as "Class 3," meaning "[p]atient is able to engage in only limited stress situations and engage in only limited interpersonal relations," Dkt. 37 at 0275. However, Dr. Hurst's prognosis is unclear. To answer the question, "Is patient now totally disabled," Dr. Hurst was directed to check "yes" or "no." Both boxes have markings. The "no" box has a discernible X mark, while the "yes" box is blacked out. Dkt. 37 at 0275. Dr. Hurst indicated Ms. Oxford became disabled on October 22, 2009 and it was "unknown at this time" whether there would be a fundamental change in the future. Dkt. 37 at 0275. Finally, Dr. Hurst indicated Ms. Oxford was not a candidate for occupational therapy or modification for her own or any other job. Dkt. 37 at 0275.

On April 5, 2010, Ms. Oxford began treatment with psychiatrist Dr. Melinda Cobb ("Dr. Cobb"). Dr. Cobb submitted a long term disability questionnaire that stated, "my understanding is the fibromyalgia and limitation[s] from work schedule are [her] primary reason[s] for leaving work." Dkt. 37 at 0297. She also stated that Ms. Oxford could resume work gradually with "less responsibility, less travel, less hours" once her pain and mood were stabilized. Dkt. 37 at 0296–97. Dr. Cobb also submitted a psychiatric "Functional Capacity Evaluation" ("FCE") that selected seven of fifteen possible areas of impairment, five of which were mild and two of which were moderate. A moderate impairment is defined as impairment that "affects but does not preclude function to perform." Dkt. 37 at 0288. Dr. Cobb indicated Ms. Oxford was moderately impaired in performing repetitive tasks due to fibromyalgia and performing under stress.

Ms. Oxford's pharmacy also submitted its records which showed prescriptions filled between April 17, 2009 and July 16, 2009. During that time period, Ms. Oxford filled and

refilled five different prescriptions for a total of fourteen prescriptions.  The drugs included amitriptyline, citalopram, zolpidem, propoxyphene, and metoprolol tartrate.

Anthem denied Ms. Oxford's claim for long term disability on May 21, 2010.  The denial letter explained that Ms. Oxford was subject to a pre-existing treatment investigation for the period of April 19, 2009 through July 18, 2009.  Anthem noted Ms. Oxford's prescription history during this period, including medications used to treat depression, chronic back pain, pain, and insomnia, conditions that were listed as Ms. Oxford's diagnoses.  Anthem stated, "This indicates you were receiving treatment during the treatment free period.  Therefore we have no alternative but to deny your request for benefits due to the Pre-Existing provision as stated in the Policy." Dkt. 37 at 0228.  In addition to denying benefits under the Pre-Existing provision, Anthem also determined Ms. Oxford's condition did not meet the policy's definition of disability. Specifically, Anthem relied upon Ms. Oxford's medical records and the independent reviews summarized above to determine the medical evidence did not objectively support disability.

On May 24, 2010, Anthem received a FCE performed by WorkWell Systems, to whom Ms. Oxford was referred by Dr. Hurst.  The FCE stated that Ms. Oxford gave "maximal effort" on all test items, has "unlimited tolerance to sitting," "has no task that she is unable to perform," and "is limited in her lifting and carrying abilities."  Dkt. 37 at 0218.  It categorized her U.S. Department of Labor Physical Demand Level as "light."

**3.      Facts Relating to Ms. Oxford's Long Term Disability Appeal and Filing of this Action:  November 2010–present**

On November 17, 2010, by counsel, Ms. Oxford appealed the denial of long term disability benefits.  The appeal included an affidavit from Ms. Oxford, a physician statement from Dr. Hurst, and a report from rheumatologist Dr. Steven Neucks ("Dr. Neucks").  The appeal asserted Ms. Oxford was not treated for fibromyalgia during the pre-existing treatment period,

11

though it did acknowledge she had been treated for back pain, depression, and insomnia.  It further asserted that Ms. Oxford's treating and examining physicians were in a superior position to determine Ms. Oxford's disability status.  It specifically stated, "Anthem has chosen to selectively discredit and disregard substantial evidence supporting Ms. Oxford's disability, which has been objectively documented since the Fall of 2009."  Dkt. 37 at 0518.

Ms. Oxford's affidavit stated that she did not visit or consult a physician, take clinical tests, receive treatment, nor take any medications for fibromyalgia during the pre-existing treatment period of April 19, 2009 through July 18, 2009.  She stated that although she had been diagnosed with fibromyalgia prior to Fall 2009, it was in "remission during the time period of April 19, 2009 through July 18, 2009."  Dkt. 37 at 0520.  She then experienced a flare-up of the fibromyalgia in fall 2009.

Dr. Hurst's statement consists of a questionnaire filled out on November 9, 2010.  In the questionnaire, Dr. Hurst indicated she had not treated Ms. Oxford nor prescribed any medication for fibromyalgia during the pre-existing treatment period.  She indicated that Ms. Oxford experienced a flare-up of fibromyalgia after July 18, 2009 that has rendered her disabled as of October 10, 2009.  Dr. Neucks created his report on October 27, 2010, after examining Ms. Oxford for fibromyalgia.  Dr. Neucks noted Ms. Oxford's history of fibromyalgia and back pain.  He determined Ms. Oxford has well-documented fibromyalgia, degenerative arthritis, carpal tunnel syndrome, and other ailments.  He agreed with Ms. Oxford's current treatment of medications and therapies.  He also stated Ms. Oxford scored 88.56 out of 100 on a fibromyalgia impact questionnaire ("FIQ").  He explained any score over 70 indicates a substantial impairment.

As part of the appeal process, Ms. Oxford's file was reviewed by Jefrey Lieberman, board certified in internal medicine and rheumatology ("Dr. Lieberman").   Dr. Lieberman reviewed Ms. Oxford's 137 page file, as well as spoke with Dr. Neucks.  Dr. Lieberman was asked to answer specific questions provided by Anthem.  He indicated there "are no identifiable records that determine that the claimant was treated for the condition of fibromyalgia" or was having symptoms related to fibromyalgia during the pre-existing treatment period.  Dkt. 37 at 0487.  He noted Ms. Oxford was taking the drug Elavil during the treatment period, which is "frequently used in treatment of fibromyalgia; however, it is also used for anxiety and depression, and it is unclear as to what its use was for on a maintenance basis for this claimant. Records indicate that it was for 'mood stabilization.'"  Dkt. 37 at 0487–88.  Dr. Lieberman found it difficult to determine restrictions and limitations based on fibromyalgia for two reasons.  First, the FIQ is a subjective scale based on patient perception.  Second, the FIQ measurement could also include perceptions from any other health issues afflicting Ms. Oxford.  He noted Dr. Neucks also stated he could not discern restrictions and limitations from any objective evidence. Despite Dr. Lieberman's stated difficulties, he still provided suggested limitations for Ms. Oxford as a sufferer of fibromyalgia.  He suggested that reasonable restrictions and limitations included:

> no lifting/carrying more than 10 lbs.; climbing; no squatting; no constant repetitive motion activities; and no swing shifts or frequent time zone traveling greater than 2 hours.  She should have a workstation with the ability to shift positions as needed and be given the opportunity to move around for 5 minutes every hour.

> The duration of these suggested restrictions is likely permanent.

Dkt. 37 at 0489.  Dr. Lieberman concluded that there is sufficient evidence in her medical record to support Ms. Oxford's diagnosis of fibromyalgia.

13

Anthem also referred Ms. Oxford's file for a vocational rehabilitation review by Nancy O'Reilly ("Ms. O'Reilly").  The purpose of this review was to determine Ms. Oxford's core tasks and her ability to perform the material duties of her own occupation.  Ms. O'Reilly first noted Ms. Oxford's job description, supplied by Ms. Oxford's attorney, her employer,[4] and her resume. Based on these descriptions, Ms. O'Reilly determined Ms. Oxford's position was best described in the Dictionary of Occupational Titles published by the U.S. Department of Labor, as "Supervisor, Claims, DOT 241.137-018 and exists in the general economy as a Sedentary Occupation."  Dkt. 37 at 0476.  Then, using a commercial software program that analyzes job descriptions and functions, Ms. O'Reilly ran a comparison of Ms. Oxford's job requirements and those of a "Supervisor, Claims."  Ms. O'Reilly concluded that "Ms. Oxford should be capable of meeting all of the physical and environmental requirements as well as performing all of the material duties of her own occupation."  Dkt. 37 at 0477.

On March 14, 2011, Anthem denied Ms. Oxford's appeal of her claim for long term disability benefits.  The denial letter detailed Anthem's review of Ms. Oxford's medical records, Dr. Lieberman's independent review, and Ms. O'Reilly's occupational review.  Anthem stated that for appeal purposes, it only considered whether Ms. Oxford was disabled as a result of her fibromyalgia.  It found that Ms. Oxford had received limited treatment during the 180 day elimination period.  It relied upon Dr. Lieberman's and Ms. O'Reilly's reviews to determine that Ms. Oxford should be able to perform the "material and substantial duties of her own occupation as an Eligibility Manager within the restrictions and limitations outlined by Dr. Lieberman."

---

[4] Ms. Oxford stated that Ms. O'Reilly did not have Ms. Oxford's official job description from her employer.  The Court notes that Ms. O'Reilly's report provides somewhat contradictory language on this point.  At first it states, "No job description for 'Eligibility Manager' was supplied by MedAssist, Inc."  Dkt. 37 at 0476.  Yet two sentences later the report states, "According to [Ms. Oxford's] employer's description of her position…."  This second sentence, which goes on to quote a job description, presumably from MedAssist, suggests that Ms. O'Reilly did, in fact, rely on a job description created by Ms. Oxford's employer.

Dkt. 37 at 0465. Furthermore, Anthem determined, "While Ms. Oxford may have been experiencing symptoms of fibromyalgia, there is no clinical evidence that her symptoms would rise to the level of functional impairment from October 22, 2009 to April 20, 2010, and beyond." Dkt. 37 at 0465. Therefore, Anthem concluded Ms. Oxford did not satisfy the 180 day elimination period and denied her claim for long term disability benefits.

On April 14, 2011, Ms. Oxford filed this action against Anthem, the STD Plan, and the LTD Plan for the wrongful termination of her short term disability benefits and wrongful denial of her long term disability benefits. (Dkt. 1.) Ms. Oxford filed a motion for summary judgment, and Anthem subsequently filed an opposition and cross-motion for summary judgment. Additional facts will be set forth below, as necessary.

## II. LEGAL STANDARD

Summary judgment is only appropriate by the terms of Rule 56(c) where there exists "no genuine issue as to any material facts and … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks–*

*Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## III.  DISCUSSION

**A.      Review of a Claim for Disability Benefits Governed by ERISA**

ERISA, or the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*, was enacted to "protect the interests of employees and their beneficiaries in pension and welfare benefit plans." *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 989–90 (7th Cir. 1993). ERISA governs employee benefit plans and provides appropriate remedies, sanctions, and access to federal court. *Id.* at 990.  Courts reviewing a denial of a claim for benefits under an ERISA plan apply a *de novo* standard unless the plan grants the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When, as in this case, such discretionary authority is present, courts apply a deferential "arbitrary and capricious standard." *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005).  The parties have stipulated that the arbitrary and capricious, or abuse of discretion, standard of review applies. (Dkt. 26).

Under this standard, the Court will uphold the plan's decision "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Sisto*, 429 F.3d at 700 (quoting *Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990, 995 (7th Cir. 2004)).  However, a "plan administrator's procedures are not reasonable if its determination ignores, without explanation, substantial evidence that the claimant has submitted" that addresses the ultimate issue. *Majeski v. Metro. Life Ins. Co.*, 590

F.3d 478, 484 (7th Cir. 2009).  Moreover, when responsibility for both claim determinations and

pay-outs is vested in the same entity, "the court is required to take such an obvious conflict of

interest into consideration—along with all of the other relevant factors—in determining whether

the entity's determination was arbitrary and capricious."  *Leger v. Tribune Co. Long Term*

*Disability Benefits Plan*, 557 F.3d 823, 831 (7th Cir. 2009).

**B.      Review of Ms. Oxford's Claims for Short Term and Long Term Disability Benefits**

The Seventh Circuit has described fibromyalgia as:

> a common, but elusive and mysterious, disease, much like chronic fatigue
> syndrome, with which it shares a number of features. *See* Frederick Wolfe et al.,
> "The American College of Rheumatology 1990 Criteria for the Classification of
> Fibromyalgia: Report of the Multicenter Criteria Committee," 33 *Arthritis &
> Rheumatism* 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine
> A. Papadakis, *Current Medical Diagnosis & Treatment 1995* 708–09 (1995). Its
> cause or causes are unknown, there is no cure, and, of greatest importance to
> disability law, its symptoms are entirely subjective. There are no laboratory tests
> for the presence or severity of fibromyalgia. The principal symptoms are "pain all
> over," fatigue, disturbed sleep, stiffness, and—the only symptom that
> discriminates between it and other diseases of a rheumatic character—multiple
> tender spots, more precisely 18 fixed locations on the body (and the rule of thumb
> is that the patient must have at least 11 of them to be diagnosed as having
> fibromyalgia) that when pressed firmly cause the patient to flinch. All these
> symptoms are easy to fake, although few applicants for disability benefits may yet
> be aware of the specific locations that if palpated will cause the patient who really
> has fibromyalgia to flinch.

*Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996).  It is difficult to determine the severity

of fibromyalgia because of the unavailability of objective tests.  *Id.*

Ms. Oxford contends that Anthem failed to provide a full and fair review of her claim for

disability benefits by unreasonably disregarding the opinions of her treating physicians.  She also

argues Anthem, as both the insurer and administrator of Ms. Oxford's benefits, has a conflict of

interest that infected the claims process.  Anthem responds that it reasonably concluded Ms.

Oxford was not entitled to benefits by relying on the medical documentation, Ms. Oxford's

treating physicians' opinions that she could perform her job with minimal restrictions, and the independent medical reviewers.  Additionally, Anthem argues Ms. Oxford was denied short term disability benefits because she was treated during the pre-existing treatment period—a point Ms. Oxford conceded in her November 17, 2010 letter appealing the denial of long term disability benefits.  *See* Dkt. 37 at 0505.

The Court will address the reasonableness of Anthem's decisions at each stage of the administrative process:  the initial short term disability benefits denial, the short term disability benefits appeal, the long term disability benefits denial, and finally, the long term disability benefits appeal.  First, however, the Court will address Ms. Oxford's argument that Anthem has a conflict of interest that must be considered when reviewing the claims.

## C.    Conflict of Interest

In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 108 (2008), the Supreme Court held that when "the entity that administers [an ERISA] plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket…. this dual role creates a conflict of interest."  The court also held that "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits" and that "the significance of the factor will depend upon the circumstances of the particular case."  *Id.*  In *Majeski*, the Seventh Circuit explained that when determining the likelihood that a conflict influenced a plan administrator's decision, courts look to "the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims."  *Majeski*, 590 F.3d at 482.

18

Ms. Oxford argues that in this case, Anthem has a significant financial stake in the outcome, specifically approximately $147,000.00. Additionally, she argues Anthem's compensation structure suggests that employees are incentivized to deny benefits claims. Ms. Oxford specifically points to the performance review of the manager involved in her claim, which stated that the manager supports finance, underwriting, and actuary departments. Finally, Ms. Oxford argues Anthem's conflict includes its contractual relationship with Reed Review Services ("Reed") and Behavioral Medical Interventions ("BMI"), the companies that staffed the independent medical reviews of Ms. Oxford's files. She argues that Anthem paid Reed and BMI substantial sums, which consequently gave the reviewers a financial incentive to support Anthem's denial of Ms. Oxford's claims.

Anthem responds that conflict of interest should not even be a factor in reviewing Ms. Oxford's claims. First, Anthem argues that the financial stake of $147,000.00 is irrelevant given Anthem's solid financial status and lack of evidence that $147,000.00 would affect Anthem's bottom-line. Second, Anthem rejects Ms. Oxford's assertion that its compensation program encourages employees to deny benefits. Instead, the evidence shows that Anthem strives for customer-orientated goals with a primary responsibility of adjudicating claims properly. Additionally, Anthem argues that Ms. Oxford mischaracterizes the manager's performance review, and asserts that any support given to finance, underwriting, and actuary departments occurs after the claims and review decisions were made. Finally, Anthem argues the amounts paid to RRS and BMI would not serve as a substantial financial incentive given the relatively low payments—around $600.00 for each review from Reed and $1,400.00 to BMI.

The Court agrees with Anthem that Ms. Oxford has not shown a significant conflict of interest. As the Supreme Court instructed in *Glenn*, the conflict of interest:

> should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including but not limited to, cases where an insurance company administrator has a history of biased claims administration.   It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy….

*Glenn*, 554 U.S. at 117 (citations omitted).  In this case, the conflict of interest has neither great nor vanishing importance, but the Court finds it does not push the case over the edge toward a finding of capriciousness.  *See Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861–62 (7th Cir. 2009).

**D.**     **Short Term Disability Claim Review**

**1.**     **Reliance on Treating Physicians or Medical Records Reviews**

The Court first points out that "the Supreme Court has rejected the argument that the opinions of treating physicians deserve special consideration in benefits determinations."  *Leger*, 557 F.3d at 832.  Moreover, any argument that Anthem did not ask for independent physical examinations of Ms. Oxford, but unreasonably relied upon document reviews has similarly been rejected by the Seventh Circuit.  *See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006) ("In such file reviews, doctors are able to fully evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation.  It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations.").  Ms. Oxford cites to the Ninth Circuit case *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011), to support her argument that Anthem should not have "accepted the medical opinions of the record reviewing physicians who had never examined Ms. Oxford" over the opinions of her treating physicians.

In *Salomaa*, the claimant suffered from chronic fatigue syndrome, a diagnosis based on subjective criteria, and depression.  Four treating physicians unequivocally concluded that the plaintiff was severely disabled, and the medical documentation established the diagnosis.  The defendant consulted two physicians to review the plaintiff's file, yet the reports were never provided to the plaintiff.  The Ninth Circuit found that "[t]he medical record by physicians who actually examined Salomaa [was] entirely one sided in favor of Salomaa's claim."  *Id.* at 676.  Because of the conflict of interest in that case, the Ninth Circuit found it possible that the "plan rejected its opportunity to see if there was another side" because of "the risk that the physicians it employs may conclude that [Salomaa] was entitled to benefits."  *Id.*  The Court finds *Salomaa* unpersuasive because the Court finds no significant conflict of interest that requires the same level of skepticism applied in *Salomaa*.

However, in a case where conflict of interest was not an issue, the Seventh Circuit has similarly held, "An administrator may give weight to doctors who did only a records review, but in this case, the evidence provided by the doctors who examined [the plaintiff] in person is so overwhelming that the reliance on record-review doctors who selectively criticized this evidence is part of a larger pattern of arbitrary and capricious decision-making."  *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 775 (7th Cir. 2010).  *Holmstrom* is also distinguishable.

Here, Ms. Oxford's medical records from her treating physicians are not "entirely one sided" or are not "overwhelming" in favor of her claim.  For example, initially Dr. Hurst diagnosed Ms. Oxford with anxiety and back strain and stated that Ms. Oxford's return to work would be determined by her counselor.  This could indicate Ms. Oxford's physical diagnosis was not the leading cause of her short term disability since the physician suggested the counselor would have discretion to determine when Ms. Oxford would be able to resume her employment.

Dr. Sailer's examination and notes indicate that Ms. Oxford's MRI was "fairly unremarkable" and not "horribly concerning."   Dkt. 37 at 0016.   Moreover, when the independent medical reviewer Dr. Fiedor spoke with Dr. Hurst, Dr. Hurst told him that "she felt that [Ms. Oxford] could do light work with a weight limitation of [ten] pounds and should be allowed to stretch periodically."  Dkt. 37 at 0085.  In short, Ms. Oxford's claim file does not contain the same type of one-sided evidence found in *Salomaa* or *Holmstrom*.   While the Court will certainly factor in Anthem's failure to examine Ms. Oxford and its reliance on independent medical reviewers, these facts are not indicative of an arbitrary and capricious decision.   Even in the cases cited above, this factor was one of many relied upon by the Ninth and Seventh Circuits.   In *Salomaa* the court focused on the plan's "shifting," "inconsistent," and "illogical" reasons for denial. *Salomaa*, 642 F.3d at 676.   In *Holmstrom*, the court also noted the plan's shifting focus and selective consideration of evidence.  *Holmstrom*, 615 F.3d at 776–77.

### 2.     Whether Ms. Oxford Received Regular Treatment or Follow-Up Care

After initially awarding short term disability benefits through December 1, 2009, Anthem rejected Ms. Oxford's claim for continued short term disability benefits based on its conclusion that Ms. Oxford was not receiving or following regular care and treatment for the claimed disabling conditions.  Anthem relied on records and notes from Ms. Oxford's December 1, 2009 appointment with Dr. Sailer, and telephone calls between Ms. Oxford and Anthem employees Tawanya Johnson ("Ms. Johnson") and Cheryl Flippo ("Ms. Flippo").   Although Ms. Oxford points the Court to Dr. Sailer's treatment notes from January 5, 2010, as well as treatment she received in February 2010, that information was not before Anthem when it denied Ms. Oxford's claim on January 19, 2010.  Therefore, when reviewing the reasonableness of Anthem's January

19, 2010 denial, the Court will only consider the same information available to Anthem at that time.

Dr. Sailer examined Ms. Oxford on December 1, 2009.  His treatment plan included stretches for Ms. Oxford's plantar fasciitis, surgical options for her carpal tunnel syndrome, and therapy, including home exercises and water therapy, for her back pain.  He did not see any benefit of an epidural injection.  It was left up to Ms. Oxford to follow up with carpal tunnel treatment.   On December 14 and 30, 2009, Ms. Oxford spoke by telephone with Anthem employee Ms. Johnson.   During both conversations, Ms. Oxford told Ms. Johnson she was unable to continue counseling because she no longer had medical insurance and otherwise could not pay for sessions.  Similarly, on January 19, 2009, Ms. Oxford told Anthem employee Ms. Flippo by telephone that she stopped going to psychotherapy because she could not pay for sessions.  She likewise stated she was not having carpal tunnel surgery because she could not pay for it without insurance.  Finally, she stated she was not going to physical therapy for her back, also because she had no money to pay for it.

Ms. Oxford argues Anthem mischaracterizes her willingness to receive medical treatment and that her inability to pay for medical treatment is not indicative of her wellness.  The STD Plan's definition of disability requires claimants to receive "Regular Care from a Physician for that Injury or Illness."  Dkt. 37 at 0630.  "Regular Care" requires personal visits to a physician as necessary "to effectively diagnose, manage and treat [the] disabling condition," and treatment "which conforms with standard medical practice by a Physician whose specialty and clinical experience is appropriate for [the] disabling condition(s) according to standard medical practice."  Dkt. 37 at 0624.  A note in Ms. Oxford's claim file indicates that Anthem acknowledged Ms.

Oxford had no money to see a doctor, but "there must be medical to support paying benefits." Dkt. 37 at 0112.

Ms. Oxford does not cite any case law for the proposition that in the ERISA context, plan administrators must consider financial hardship. The Court likewise cannot find any reported cases that discuss the relevancy of financial hardship in the ERISA context. The Court does note *Williams v. Delta Family-Care Disability & Survivorship Plan*, No. 07-CV-5329(CPS), 2009 WL 57138 (E.D.N.Y. Jan. 7, 2009), an ERISA case in which the court considered the plaintiff's argument that financial hardship prevented her from seeking more frequent treatment. *Id.* at *12. There, the plaintiff cited Social Security cases which generally held that "it flies in the face of the patent purpose of the Social Security Act to deny benefits to someone because he is too poor to obtain treatment that may help him." *Id.* The court distinguished the cases, because often in ERISA cases, financial hardship is generally not relevant when claimants are already receiving Social Security payments and Medicare. *Id.* The court also specifically distinguished the cases on their facts, because in the cases cited "it was error to consider the failure to follow a prescribed course of treatment or seek medical treatment as evidence that a claimant was not disabled, without considering whether the claimant was able to afford such treatment. In this case, the Administrative Committee did not consider plaintiff's failure to remain under the care of a physician for her disability as evidence that she was not disabled." *Id.* (citation omitted).

In *Nord*, the Supreme Court distinguished the Social Security program and ERISA benefit plans. Specifically in the context of the treating physician rule, the Court stated, "Along with other regulations, the treating physician rule works to foster uniformity and regularity in Social Security benefits determinations made in the first instance by a corps of administrative law judges." *Nord*, 538 U.S. at 833. In contrast, under ERISA, "employers have large leeway to

design disability and other welfare plans as they see fit….The validity of a claim to benefits under an ERISA plan, on the other hand, is likely to turn, in large part, on the interpretation of terms in the plan at issue." *Id.* (internal quotation marks omitted).  The court went on to say, "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence." *Id.* at 834.

Ms. Oxford does direct the Court to *Winters v. UNUM Life Insurance Co. of America*, 232 F. Supp. 2d 918, 932 (W.D. Wis. 2002), an ERISA case in which the defendant did not address the plaintiff's justification for not seeing a doctor more often.  In that case, the plaintiff suffered from post-polio syndrome, for which there is no treatment or cure, and thus it is not necessary to visit a doctor often.  The court found that the defendant's conclusion that the plaintiff was not under the regular care of a doctor was "a conclusion rather than a reason because it lacks an explanation of what constitutes 'regular' care in light of plaintiff's medical condition." *Id.* (citing *Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 392 (7th Cir. 1983), *abrogated on other grounds*).  The court found that the defendant failed to provide reasons why plaintiff was not under regular care "given his untreatable medical condition and his annual visits to a specialist." *Id.* at 933.

The Court finds itself in a difficult position, where on the one hand, Anthem's definition of disability clearly requires continuing and personal care and appropriate treatment to support a finding of disability.  On the other hand, there is no reason to doubt Ms. Oxford's claim of financial hardship, when she was not yet receiving Social Security benefits or Medicare.  Additionally, although Ms. Oxford may not have been able to continue treatment with her regular caregivers, there are clinics that offer both physical and psychotherapy at minimal or no costs to uninsured and underserved patients.  While the Court empathizes with Ms. Oxford, it

25

cannot hold that Anthem arbitrarily refused to give weight to her claims of financial hardship as a reason for discontinuing or delaying treatment. The facts are that the records before Anthem, at the time of its January 19, 2010 denial, showed that Ms. Oxford had not undergone any treatment since early December 2009 despite being referred to both physical therapy and psychotherapy for her conditions. Unlike where in *Winters* the plaintiff's condition did not require frequent appointments or treatment, in this case, Ms. Oxford's reasons are unrelated to her condition. Anthem's adherence to its definition of disability and its requirement of regular care was not unreasonable. *See id.* (giving deference to the Secretary of Labor's view that "ERISA is best served by preserving the greatest flexibility possible for operating claims processing systems consistent with the prudent administration of a plan" (internal quotation marks omitted)).

### 3.   Whether Ms. Oxford Was Treated During the Pre-Existing Period

When Anthem reviewed its decision to deny Ms. Oxford's short term disability benefits beyond December 1, 2009, it conducted for the first time a pre-existing treatment investigation, a condition required by the STD Plan's definition of disability. In *Holmstrom*, the Seventh Circuit found one sign of arbitrary and capricious decision-making when the defendant "repeatedly 'moved the target.' Over the course of the administrative appeals, [defendant] invited additional evidence to establish disability, but when [plaintiff] provided it, [defendant] repeatedly found that the new evidence was not sufficient under new standards or expectations that had not been communicated to [plaintiff]. Such conduct frustrates fair claim resolution and is evidence of arbitrary and capricious behavior." *Holmstrom*, 615 F.3d at 775–76. Therefore, the Court is cognizant of Anthem's changing reasoning for denying Ms. Oxford's short term disability claim.

However, here, the Court does not find that Anthem acted arbitrarily and capriciously by instigating its pre-existing treatment investigation after Ms. Oxford's initial denial. On March 18, 2010, Ms. Oxford was notified that the pre-existing treatment investigation was required and Anthem was requesting medical records from April 20, 2009 through July 19, 2009. Ms. Oxford complied with Anthem's requests. Anthem then relied upon the newly submitted information, as well as independent medical reviews, to make its final decision.[5] Unlike in *Holmstrom*, Anthem informed Ms. Oxford it would conduct a pre-existing treatment investigation, and then relied upon that specific investigation to deny her claim. Therefore, the fact that Anthem changed its reasoning, in this case, does not render the decision arbitrary and capricious. *See Holmstrom*, 615 F.3d at 767 ("The plan administrator is entitled to seek and consider new information and, in appropriate cases, to change its mind.").

Anthem determined that Ms. Oxford was taking five medications during the pre-existing treatment period: (1) propoxyphene-N, used to treat pain; (2) amitriptyline (Elavil), used to treat symptoms of depression; (3) zolpidem (Ambien), used to treat insomnia; (4) citalopram (Celexa), used to treat depression; and (5) metoprolol tartrate, used to treat high blood pressure. Only one of the three independent medical reviewers noted the use of these medications in response to the specific question, "Does the medical documentation suggest the claimant was being treated or taking medication during the defined pre-existing period of April 20, 2009–July 19, 2009." But, Ms. Oxford's prescription history does list the medications and dates as falling within the relevant time period. Moreover, in a letter appealing Ms. Oxford's long term disability benefits, Ms. Oxford agreed that she "received treatment for depression, insomnia, and chronic back pain" during the pre-existing treatment period. Dkt. 37 at 0505. The Court finds that on the basis of

---

[5] The independent medical reviews each indicate that Ms. Oxford's therapy and treatment was "appropriate," which strongly suggests that on appeal, Anthem could not have determined Ms. Oxford was not receiving "regular care."

the facts in the record, Anthem had a reasonable basis for determining Ms. Oxford was treated during the pre-existing treatment period for depression and/or anxiety and back pain.  Therefore, its decision to deny short term disability for this reason was not arbitrary and capricious.

   4.     **Fibromyalgia as the Cause of Ms. Oxford's Disability**

   When Ms. Oxford first applied for short term disability benefits, the disabling diagnosis was listed as "anxiety, back strain."  Dkt. 37 at 0057.  Ms. Oxford now argues that her disabling condition was fibromyalgia, and that she provided ample evidence to Anthem supporting this fact.  Anthem argues the first time Ms. Oxford mentioned fibromyalgia as a disabling condition was in her January 28, 2010 appeal of the short term disability benefits and that in response, it had a rheumatologist review Ms. Oxford's claim file.  Anthem ultimately concluded that the objective medical evidence did not support Ms. Oxford's disabling condition.  As stated above, the Court will consider the record before Anthem at the time of its denial of Ms. Oxford's short term disability benefits.

   Dr. Hurst's November 19, 2009 and January 5, 2010 notes list fibromyalgia and the medication Savella, which is used to treat fibromyalgia.  Dr. Sailer's December 1, 2009 notes state that Ms. Oxford has a history of fibromyalgia with sporadic symptoms, but the notes did not positively diagnose fibromyalgia.  Ms. Walton's counseling records from October 27, 2009 list fibromyalgia "flare ups" as a patient complaint.  Dr. Hurst told reviewer Dr. Fiedor in May 2010 that Ms. Oxford had a diagnosis of fibromyalgia but that there were "no objective findings and no obvious deformities upon examination."  Dkt. 37 at 0085.  Dr. Hurst told reviewer Dr. Payne that she, Dr. Hurst, had diagnosed Ms. Oxford with fibromyalgia in August 2009.  Dr. Payne's rheumatology review of Ms. Oxford's file stated that "[n]owhere in the medical record is there documented information or any descriptions of any inflammatory rheumatic disease process.

28

There was no specific mention of any systemic rheumatic disease pattern of behavior of the symptoms." Dkt. 37 at 0088.

Ms. Oxford argues that the inability to assess her fibromyalgia with objective evidence does not preclude her from receiving disability benefits. Ms. Oxford's underlying proposition is correct, and the Seventh Circuit in many cases has held that the severity of fibromyalgia and similar conditions cannot be determined by objective tests. For example, in *Holmstrom*, the defendant denied plaintiff's claim of disabling complex regional pain syndrome ("CRPS") in part because "normal" test results undermined the diagnosis. *Holmstrom*, 615 F.3d at 768. However, the tests were designed to rule out other diagnoses, and neither supported nor contradicted the plaintiff's diagnosis which was otherwise supported with "clinically observable indicia of CRPS." *Id.* at 769. In *Hawkins*, the Seventh Circuit clarified that fibromyalgia could be "diagnosed more or less objectively by the 18-point test," but that "the amount of pain and fatigue that a particular case of it produces cannot be." *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003).

The Court finds the distinctions in *Holmstrom* and *Hawkins* instructive in this case. Ms. Oxford's fibromyalgia could have been "more or less" objectively observed or diagnosed with the standard 18-point test described in *Hawkins*. The Court can find no evidence in the records before Anthem in January 2010 through May 2010—the time period during which Ms. Oxford's short term disability benefits were denied—that documents how Ms. Oxford's fibromyalgia diagnosis was reached. Neither did the rheumatology independent medical reviewer find such evidence. Moreover, Dr. Hurst provided no objective test results or observations of how much Ms. Oxford's degree of pain limits her functional capabilities. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007). Therefore, the Court cannot hold that Anthem acted

29

arbitrarily and capriciously concluding there was no objective evidence to support Ms. Oxford's

disabling conditions, including fibromyalgia, when it denied her short term disability benefits.

**E.      Long Term Disability Claim Review**

   **1.      Initial Denial Based on 180 Day Elimination Period & Pre-Existing Treatment**

Anthem denied Ms. Oxford's long term disability benefits because it concluded she did

not meet the definition of disabled during the entire 180 day elimination period, as required by

the LTD Plan.  It also concluded she had received treatment during the pre-existing treatment

period.  The 180 day elimination period was October 22, 2009 through April 20, 2010.  The pre-

existing treatment period was April 19, 2009 through July 18, 2009.  When determining Ms.

Oxford's long term disability benefits, Anthem considered the independent medical reviews of

Dr. Fiedor, Dr. Payne, and Dr. Goldman, Ms. Oxford's Activities of Daily Living form, Ms.

Oxford's resume, the attending physician statements, updated medical records from Ms.

Oxford's treating physicians, and Ms. Oxford's pharmacy records.  Anthem's reasoning for

denying Ms. Oxford's long term disability benefits was nearly identical to its reasoning for

denying her short term disability appeal.  For her contention that Anthem acted arbitrarily and

capriciously in denying her long term disability benefits, Ms. Oxford puts forth the same

arguments the Court has already considered; specifically that Anthem rejected the opinion of her

treating physicians, and inappropriately relied on independent medical reviews, and that Anthem

disregarded evidence of fibromyalgia.

The Court finds, as it did above, that Ms. Oxford's arguments fail to show Anthem acted

arbitrarily and capriciously when it denied her long term disability benefits.  There is support in

the record that Ms. Oxford was treated for back pain, depression, and anxiety during the pre-

existing treatment period, a fact conceded by Ms. Oxford in her long term disability appeal.[6]  Ms. Oxford's treating physicians did not overwhelmingly state that Ms. Oxford was completely disabled, and the independent medical reviewers spoke with Ms. Oxford's treating physicians when conducting their reviews.   Specifically, Ms. Oxford's doctors did not support their conclusions with objective evidence indicating Ms. Oxford's diagnosis or functional limitations. Moreover, although it is not entirely clear whether Dr. Hurst answered "yes" or "no" to the question, "Is patient now totally disabled," the Court finds that given the appearance of the markings and other answers, it was rational for Anthem to interpret the answer as "no."  As the Seventh Circuit has said, "the question isn't whether *we* would have terminated [plaintiff's] benefits, but whether [defendant's] decision to do so finds 'rational support in the record.'" *Jenkins*, 564 F.3d at 860.  The Court finds there was rational support in the record for Anthem's denial of Ms. Oxford's long term disability claim.

### 2.     Ms. Oxford's Long Term Disability Appeal Focusing on Fibromyalgia

When Ms. Oxford appealed the denial of her long term disability benefits, she submitted additional documentation supporting her disabling condition of fibromyalgia.  The documents included an affidavit from Ms. Oxford stating she did not receive treatment for fibromyalgia during the pre-existing treatment period.  Additionally, she submitted a statement from Dr. Hurst that Ms. Oxford has been disabled by fibromyalgia since October 10, 2009.  Finally, she submitted a report from a rheumatologist, Dr. Neucks, whom Ms. Oxford saw on October 27, 2010—approximately one year after Ms. Oxford's claimed disability began.  Dr. Neucks agreed with Ms. Oxford's fibromyalgia diagnosis and his notes state that her fibromyalgia is "well documented with tender points and meeting the current ACR criterion."  Dkt. 37 at 0512.  Dr.

---

[6] Ms. Oxford did not concede she was treated for fibromyalgia during the pre-existing period, however.

Neucks also reported Ms. Oxford scored 88.56 out of 100 on the FIQ, where any score over 70 indicates severe impairment.

Anthem responded to Ms. Oxford's appeal and focused its review on fibromyalgia. It had Dr. Lieberman, a rheumatologist, review Ms. Oxford's file. Significantly, Dr. Lieberman found no indication that Ms. Oxford had been treated for or had symptoms of fibromyalgia during the pre-existing treatment period. Also, Dr. Lieberman opined that, "Based on the criteria set forth by the American College of Rheumatology and the records that I have reviewed from Dr. Neucks, there is sufficient support to determine that the claimant does have this diagnosis." Dkt. 37 at 0489. However, Dr. Lieberman also spoke with Dr. Neucks who told Dr. Lieberman "he was unable to discern restrictions and limitations on a fibromyalgia basis from any objective evidence, but did feel that her level of distress would certainly limit her from performing occupations of any type." Dkt. 37 at 0488. Dr. Lieberman did not find the clinical evidence to support Dr. Neucks's statement, and therefore he recommended permanent work restrictions and limitations specific to Ms. Oxford.

Anthem also conducted an occupational review to evaluate Ms. Oxford's ability to perform the material and substantial duties of her position. The review, completed by Ms. O'Reilly, categorized Ms. Oxford's position as "sedentary" and concluded that Ms. Oxford should be capable of meeting all the physical and environmental requirements, as well as performing all the material duties of her own occupation.[7]

---

[7] Ms. Oxford argues that Ms. O'Reilly mistakenly categorized her position as sedentary, and suggests Ms. O'Reilly was biased by an incentive to increase Anthem's profits by denying disability claims. For support, Ms. Oxford cites to Ms. O'Reilly's resume, which states that she reduced Anthem's costs as Disability Manager. Anthem responds that the record does not support this speculation, and Ms. O'Reilly's resume likely refers to financial accuracy in determining claims. The Court is inclined to agree with Anthem. Ms. Oxford's assertion of bias is a broad speculation, not supported by the record.

Anthem denied Ms. Oxford's appeal on the basis that "there is no clinical evidence that her symptoms [of fibromyalgia] would rise to the level of functional impairment from October 22, 2009 to April 30, 2010, and beyond.  As a result, Ms. Oxford did not meet the 180 day Elimination Period and is not eligible for LTD benefits."  Dkt. 37 at 0465–66.  Anthem also stated, "that while we respect the opinions of Ms. Oxford's treating physicians, that the fact of the matter is that Ms. Oxford received limited treatment during the timeframe in question," the 180 day elimination period.  Dkt. 37 at 0463.  While Anthem did not use a lack of regular care as a reason for denying benefits, it appears Anthem found Ms. Oxford's failure to seek more frequent and specialized treatment relevant to determining her disability status.

The dispositive issue when reviewing Anthem's denial of Ms. Oxford's long term disability appeal is whether Ms. Oxford's fibromyalgia made her unable to perform the material and substantial duties of her occupation during the elimination period.  There is conflicting evidence in the record as to whether Ms. Oxford's occupation was considered "light duty" or "sedentary."  Ms. O'Reilly categorized Ms. Oxford's occupation as "Supervisor, Claims," a sedentary position, based on Ms. Oxford's job description.  However, Ms. Oxford's short term disability case manager categorized the job description as "light."[8]  Furthermore, there is conflicting evidence in the record as to whether Ms. Oxford could perform "light" work or "sedentary" work.  In a conversation with Dr. Fiedor, Dr. Hurst reportedly stated that Ms. Oxford was capable of light work with certain limitations, with which Dr. Fiedor agreed.  But Dr. Hurst's physician statement for long term disability benefits stated that Ms. Oxford was limited to sedentary work.  Dr. Cobb stated that Ms. Oxford could resume work gradually with limitations, but did not use a label such as "light" or "sedentary."  Dr. Lieberman similarly

---

[8] A Functional Capacity Evaluation performed by WorkWell Systems also classified Ms. Oxford's job as "light." However, none of Anthem's denials reference this FCE or rely on it as evidence and Ms. Oxford objects to Anthem's citation to the FCE as evidence in this case.

recommended permanent limitations, but did not use a label such as "light" or "sedentary" in regard to Ms. Oxford.[9]  Dr. Payne, upon review of Ms. Oxford's file, found no evidence that restrictions or limitations were necessary.

Viewing the facts in the light most favorable to Anthem, the Court must grant Anthem deference for its conclusion that Ms. Oxford could perform the duties of her occupation; there is rational support in the record for this conclusion.  Anthem argues that its reliance on Ms. O'Reilly's in-depth and detailed analysis, which considered a number of factors and criteria, was proper.  Having reviewed Ms. O'Reilly's report, the Court must agree that Anthem's reliance was rational.  Even viewing the facts in the light most favorable to Ms. Oxford, the Court at best notes the conflict of fact, but cannot find that Anthem's conclusion was arbitrary and capricious when applying proper deference.  If Ms. Oxford's position is sedentary—and there is rational support in the record for that fact—Ms. Oxford's medical records, including those from her treating physicians, support the conclusion that Ms. Oxford is able to perform sedentary work.  Therefore, the Court cannot hold that Anthem's decision was arbitrary and capricious when it denied Ms. Oxford's long term disability appeal.

## F.    Dismissal of Defendant Anthem Insurance Companies, Inc. as an Improper Party

Anthem argues that Defendant Anthem Life Insurance is an improper party, because it is not the Plan as an entity.  *See Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 872 n.4 (7th Cir. 2001). Although Ms. Oxford objects to the form of the motion, she does not object to the dismissal of Defendant Anthem Life Insurance as a party.  Because the Court grants summary judgment in favor of Anthem, it need not decide this issue.

---

[9] Dr. Lieberman did say that "most" fibromyalgia patients can perform light or sedentary work, but general evidence of this sort is not a basis for determining disability and the Court does not consider it as such.

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that Anthem's denial of Ms. Oxford's short term and long term disability benefits was not arbitrary and capricious.  Therefore, Ms. Oxford's motion for summary judgment (Dkt. 39) is **DENIED**.  Anthem's motion for summary judgment (Dkt. 45) is **GRANTED**.

SO ORDERED:

Date: 09/25/2012 _____

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kristopher N. Kazmierczak
KATZ & KORIN P.C.
kkazmierczak@katzkorin.com

Sally F. Zweig
KATZ & KORIN P.C.
szweig@katzkorin.com

Amanda Lynn Yonally
O'RYAN LAW FIRM
ayonally@oryanlawfirm.com

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Nicholas Thomas Lavella
O'RYAN LAW FIRM
nlavella@oryanlawfirm.com